Nedkova v. Ashcroft Good morning, Your Honour. Mark Vanderhout, appearing on behalf of Ms. Nedkova along with Joanne Lynn from my office. This case involves a Roma woman who fled for her life from Bulgaria after suffering years of police brutality as well as violent and potentially lethal treatment at the hands of her ethnic Bulgarian husband. All account on a race. Three years ago, Petitioner was interviewed by the Immigration and Naturalization Service asylum officer who found that she had established a reasonable fear of persecution and referred her case to an immigration judge for review. She has remained in custody now for three years because the immigration judge and the BIA in appeal disagreed with the asylum officer's determination. We believe that Petitioner's testimony, which both the BIA and the immigration judge found credible, corroborated by extensive country condition documentation, clearly established both past persecution and a clear probability of future persecution, and the Board committed reversible error in finding to the contrary. Though finding Petitioner credible, the Board held that the harm inflicted on Petitioner by the police on account of a race, which they did find, was not severe enough to constitute persecution. Rather, it held that it was mere discrimination. And as to the beatings by the husband, the Board did not dispute that the harm was severe enough to constitute persecution, nor that the government was unwilling to control him, but they found that Petitioner had not established that the constant beatings were on account of race. We believe there's no support whatsoever in the record to support the Board's conclusions. As to the issue of the police, which I'd like to concentrate on first, the incidents that occurred were five unwarranted detentions, no criminal charges, no charges whatsoever, lasting for many hours apiece. There's some questions as to whether there were five or four. She testified that there were five. She described, her attorney elicited descriptions of four of those incidents. In one of those, there was a brutal beating by the police that resulted in cracked ribs that required medical treatment. And in one of those, she was threatened with wanted to get happy with her. The beating itself in detention, we believe, under the circumstances is enough to establish past persecution. But certainly, even if the Court disagreed on that one instance enough, the cumulative effect of the five detentions and the beating is enough under the case law to establish past persecution, and then add to it the threat of rape, and the evidence is overwhelming that there has been past persecution. That is really the only issue on the police misconduct, because the Board recognized that it was on account of race. They just said it was discrimination, not persecution. And we think there's no support to finding that this level of mistreatment of someone is solely discrimination. As to the next issue, just in case that's an issue, she was arrested with other role models. They were gypsies. They were derogatorily called their individuals. She was detained with 20 other Roma at a time. She was rebuked for speaking to ethnic Bulgarians in a certain way. There's no dispute that that was on account of her ethnicity. Now, as to the husband, the issue – So you say there was no dispute about any of the police detentions related to her ethnicity? Correct, Your Honor. The Board of Immigration Appeals found – they say persecution is an extreme concept which does not include discrimination on the basis of race, religion, and does not include every morally reprehensible treatment. We find that the respondents' experiences with the Bulgarian police do not rise beyond the level of discrimination. So the Board accepts the fact that this was done to her because she was Roma or gypsy, as they derogatorily called their – but they just said these things don't rise to the level of persecution, and we think that they're wrong on that. As to the husband, the Board doesn't dispute that the harm inflicted is certainly persecution. He beat her constantly throughout their relationship. He caused her miscarriage, and she miscarried during that incident. There's no question that the harm was severe. What the Board said there is, well, how do we know this is on account of her being Roma? Well, there, this Court's decision in Borfa would control – he – first of all, when he beat her, he called her gypsy, and he said, you can't, as a gypsy, have my child. It is clear under the case law that when someone inflicts harm and yells epithets like that, that that is certainly on account of the – What's in the record as to her asking for help from the police against her husband? Correct. The evidence is very strong on that point. She called the police several times, and they refused to do anything. They came and said – and, matter of fact, they did come – and they said, this is a private family matter. We're not going to intervene. And then the record is overwhelming in the Department of State country reports and other documentation that the police will refuse to do anything on domestic violence, and also that the police discriminate and persecute Roma, or as they say, they're called derogatorily there, gypsies. So it's overwhelming there. So I don't think there's any dispute about the fact that there was persecution here. The government's main argument is, well, you shouldn't grant – you shouldn't order grant to withholding. You should remand to the agency for further determination. And we think that is inappropriate here, and certainly given her three years in custody waiting for justice, we think it would be – add to the injustice. But we don't think – Well, wait a minute. Even if we agree with you that this record compels the conclusion that there was persecution, what about the nexus to – or the tie to the protected ground? Well, as to the – Because she was – I guess you're contending because she was a Roma, right? That's absolutely correct, Your Honor. And the board has already found that the harm to her was on account of that, but they just said it was discrimination. What about from the police or from government? No. As to the police, the board does not dispute that the harm was based on her being Roma. They just said it wasn't severe enough to rise to persecution. As to the husband, they dispute that there was a nexus there, but we think on the record that can't be supported because he's yelling at her, you gypsy, and you can't have my kid as a gypsy, et cetera. So we think it's clear. Plus, the record is clear that there's tremendous discrimination and persecution of Roma there. But so the major issue, I believe, is whether this should be remanded or not. And the government makes the following arguments, which we think don't support a remand, which is that it What's a changed condition? That there's a divorce. The government does not argue that there's any change in country conditions, that there's not discrimination or persecution of Roma anymore. They just say remand because of the divorce. Well, two things. One, the divorce is an issue that isn't relevant to the persecution by the police. And secondly, the record already showed that they were divorced at the time of the immigration judge's determination and the board's decision. So there would be no point for remand there. As to the issue of internal relocation, could she be safe somewhere else? As to the police persecution, there's no point in remanding there because there's a presumption that when the government is the persecutor, no place is safe for the individual in that country. And the government never presented. I mean, that doesn't mean the government shouldn't have an opportunity to rebut that presumption. Assuming, as you do, that that presumption applies here, right? Well, presumption would apply if there's past persecution. I know that. Assuming that's true, why should the government be denied the opportunity to rebut that presumption? Or if the government's a persecutor, then even if there hasn't been past persecution, the presumption is true. Now, why shouldn't the government be allowed to go back and present evidence on this? Because they had the opportunity at the immigration court. Well, not really, because the immigration court said the presumption didn't apply. But that was at the end of the hearing, Your Honor. There's a hearing where both sides present their evidence. The government didn't present evidence that there was a change in country conditions or that she could internally relocate somewhere else. More importantly, the board addressed that issue. The board already addressed the issue of internal relocation. And as the husband said, she could relocate safely. We don't think that's supported by substantial evidence. It addressed it by sort of reversing the presumption. It did address it by reversing the presumption. But the government didn't present any evidence in court that she could be safe in other parts of the country vis-a-vis the police. So you say the way we should read Ventura is that on any issue on which the government has had one crack at presenting evidence, remand to the board is not necessary for a redetermination of that issue. Well, there's nothing in the record to where the government presented evidence saying she could safely be somewhere else. And because there's a presumption when the police are the persecutor. If the government's initial position is that there hasn't been persecution and they succeed on that, why should they do anything else at that time? If we were to reverse and say yes, indeed, she was persecuted, does the government then not have the opportunity to present evidence that she could be relocated? I know it's the government's burden, but when do they have to meet that burden? They have to do it during the deportation hearing where there's an evidentiary hearing where there's cross-examination of witnesses and evidence objected to or not. They have an opportunity at that hearing. They have an opportunity, but do they have an obligation when their theory is that there was not persecution? I believe they do, Your Honor. You can't have a situation where there's a trial and everybody presents their evidence, both sides, then the court issues a decision sometime later and says we find for the petitioner there's been persecution here. And the government says, well, wait a minute, now that you don't agree with us, we want a chance to come back in and show you why she could relocate somewhere else. They have the obligation at the deportation hearing. What authority do you have for that that would overcome this Ventura case which whacked the Ninth Circuit once again? It's the evidentiary procedures in the immigration proceeding. You can only introduce evidence after a hearing is closed by virtue of a motion to reopen if you can show that you could not have presented that evidence at the time of the hearing. It's not an endless procedure for the government to come back in and say, well, wait a minute, now that you don't agree with us, we want a chance to reopen the record. Nobody pointed it out to the Supreme Court in the Ventura case. I wasn't arguing that case, Your Honor. We have to live by it. No, you have to live with Ventura, but Ventura was a very, very specific factual situation. There you had a situation where it was, first of all, it was five years later, and the court was presented with evidence. The court was presented with changed country conditions evidence, and that is the key difference. In the immigration proceeding, the court was presented with that, the immigration court. The board didn't reach that issue. So the board didn't reach that issue. So it should now reach the issue. This is very different. There wasn't evidence presented here. The immigration judge didn't rule in that way as the immigration judge did address the issue of changed country conditions in Ventura, and so there's nothing for the board to review. If you sent this back to the board. We understand your position. You can see you're three minutes over your time already, so let's hear from the other side. Thank you, Mr. Van Dahl. Good morning, Your Honors. Laura Flippen for the Respondent. Good morning. The issue in this case is really very simple. It's a question of whether the board's decision denying withholding is supported by substantial evidence. And in this matter, the government submits that the board's decision is indeed supported by that standard. This is not a case where the evidence is so compelling that, as Elias Zacharias tells us, that no reasonable fact finder could fail to find the requisite fear of persecution in this matter. How much more evidence would one need to show that there was a certain amount of hostility from husband to wife? Your Honor, first is the government submitted the hostility from the husband to the wife is not on account of a statutorily protected ground. And that is the crux of the problem here. There's no nexus between the husband's behavior towards his wife. Was it incumbent on the husband to say, I'm beating you because of a statutorily protected ground? I think there has to be more evidence than what exists in this record, Your Honor. The husband in this case, there is no question, as the government indicated in its arguments to this Court on the record, that the husband's behavior was abhorrent. He is a violent, drunk person. And he certainly hurled a lot of epithets at his wife. He behaved in an egregious manner towards her. But he did so for reasons that are not clearly related to her Roma ethnicity. Well, how do we know that, apart from the characterizations of her as a Roma whatever? Well, she stated in her testimony that he abused her when he was drunk. Clearly, the drinking is a factor in his behavior towards her, that he called her a whore, that he called her somebody who was good for nothing more than making money for him, that his anger towards her is not because of her ethnicity. It's because of his own rage for whatever reason. There are many reasons why people have domestic disputes, and they can be violent, ugly, and abhorrent, but they are not a statutorily protected ground in this matter under the statute. If we were to assume that he was abusing her, at least in part because she was a Roma, then is the next step whether the police had an obligation to provide protection, which they did not do? If this Court found, Your Honor, that there was a nexus and that he was abusing her because she was Roma or half-Roma, the question would then be under the withholding standard whether the government, a governmental actor was unwilling or unable to protect her. She, you know, did make calls to the police, as her testimony indicated. There's no evidence that they failed to respond to her because she was Roma. It's just simply that they don't respond to domestic abuse cases. Well, I don't think that the police, if they just failed to respond and provide any protection, if, in fact, the husband was abusing her because she was Roma, the police wouldn't have to refuse to protect her because she was Roma. They just, if there's proof that they failed to protect her, would that not be enough? It is the husband's actions that are central, yes, Your Honor. What that would demonstrate then would be that there was evidence of past persecution. And then under the regulations that the service has promulgated, there would be a presumption of a future persecution. And then, as Your Honor was discussing with my colleague, the question would be whether that future persecution would be something that could be avoided on the basis of relocation due to changed circumstances. The standard in the statute is, give me just a minute, I want to get the language right because it's changed. The question is whether there would be a fundamental change in circumstances since that past persecution, such that the life of freedom would not be threatened. And the government should have the opportunity then to be able to present evidence as to whether there indeed is a change that would afford the alien an opportunity to return without that, again, standard where it was a clear probability that she would be persecuted in the future. Turning back to the conduct of the police against her, I think under our case law, as a matter of law, perhaps she was persecuted. She was picked up at least four times. She was beaten severely once and threatened with rape another time. Under our authority, I think that would be persecution as a matter of law if those things were established. I think some of those things have not been established, Your Honor, if I could just address those. On three of her four arrests, she was detained for some time. She was not harmed in any way. She was asked for an identity card or some sort of document. That's fairly common in these former communist countries. And the alien herself admitted that the authorities routinely ask everybody for that kind of information. Yes, but do they pick them up and hold them for a while? Your Honor, it's not clear from the ‑‑ there's nothing in the record that indicates that either they are or aren't held for a while, whether they're other people other than Roma. On the one occasion where she was detained and where she was beaten, she alleged that she was beaten and injured in the IJ, and the board did find her testimony credible on that point, there is one instance of that. There's not sufficient that could show that this rose to the level of persecution. It certainly might be behavior and conduct that would be wrong and problematic, but it's not on a level of persecution. There has to be something more than one incident, particularly on other incidents she's left unscathed. One incident where you're seriously injured, I would think, would have more weight than one where you were just tapped on the back. I think, yes, it would be more severe than an incident where you were tapped on the back. As the Court well knows, there's sort of a continuum in the law, the question of when does something convert from ‑‑ You mean they have to bring her in and break her ribs twice? Your Honor, the government doesn't dispute that that's certainly, you know, distasteful and abhorrent behavior, again, but the question is whether it rises to a level of persecution, something that goes far beyond one incident, when there are other incidents where she wasn't harmed. I think that's the countervailing issue here. There were other incidents where she was picked up by the police and she wasn't harmed. She was detained, she was asked for documents and she was let go. There wasn't the injury to her. As to the threat to rape, I think that the record is not conclusive as to whether that was indeed a threat to rape. She stated that the ‑‑ her attacker said something about that it would be bad for them, it would not be bad for them to get happy and play around with her, I think, was the language. That language she's citing could mean other things other than raping someone. It could ‑‑ it's not clear they didn't say we are going to rape this person. It's also not clear that it was directed specifically at her. And it's a ‑‑ under the Lim case, I think that the simple threat without more conclusive evidence doesn't make that something that would compel a persecution conclusion there. Mr. Blinken, in the government's brief, I'm not sure that you were the author of this, but you can tell me, I was puzzled to see the argument on pages 38 to 39 with respect to the husband's treatment of the petitioner, that Desi Arnaz had not found that Lucille Wall's references to his ethnicity really reflected any ethnic hostility, but merely anger. Does that strike you as a case history that's analogous to ours? I think it is not directly on point, Your Honor. It is indicative, again, as I indicated in the beginning of my argument, that husbands and wives and domestic partners and people in any kind of intimate relationship or otherwise have disputes. Some of those result in violent and abusive and abhorrent behavior that ‑‑ Alleged to have physically beaten her husband very frequently. Was she? I don't know whether she was or not, Your Honor. But also, I think in fairness, you know, that reference, I think, also raises the question if the husband had this racial hatred of gypsies, I mean, why would he marry one, right? Well, I think that's a good point, Your Honor. If he had such racial animus, why would he have married somebody in the first place who was from an ethnicity that he abhorred? And I think that it is certainly conceivable, and the point of the government's point in the brief was to indicate that it is certainly conceivable that someone could use a racial or an ethnic epithet to refer to their spouse, you know, by some very derogatory term, and it's a way of retaliating in a moment of heat or of anger. In this case, this gentleman's anger went far beyond simple disputes, but they were for a variety of statements that he made. And again, his wife indicated that the abuse occurred when he was drunk, and that that was a very critical factor here. I think the ethnic comment that he hurled was one among many that were not intended to be a debate. If he had been sober, then the Petitioner's case would be a stronger one on this issue. I can't say that, Your Honor. I think this is one factor. It's not clear from the record that he always was drunk when he abused her. It may have occurred at other times when he was sober, but there were – Ms. Ball, she was not intoxicated, was she? I'm sorry, Ms. – Ms. Ball was not intoxicated. Again, Your Honor, I'm not – I'm not sure. Probably at some time she was. But, you know, but the ethnic motive doesn't have to be the sole or even the predominant motive, right? That's true, Your Honor, but there has to be some sort of clear nexus. And here I think where there were a lot of things that this very despicable ex-husband said to her and did to her, and there was a confluence of things that he was doing, it's not clear that they were, again, on the basis of animus, where he had chosen in the first place to marry someone who was of this ethnicity. Your Honors, I see my time is up. If I can just briefly indicate, Your Honors have not asked. The government does, of course, submit that the cat argument that the alien has raised here is waived because, as the board explicitly found, she did not raise that before the board on appeal. Say that again, please. I wasn't arguing here either. That's correct, Your Honor. I was just noting it for the record. The cat claim that the alien noted in her brief. For the reasons that the government has stated here, Your Honors, we would ask the court to affirm the board's decision denying withholding. If the court were to find, of course, that there was persecution on account of a statutorily protected factor that resulted in a probable future persecution, the government would request remand under Ventura to the board to determine whether there are change circumstances. Even though, as Mr. Vanderhout says, you already have one chance. I think that's extremely contrary to what the Supreme Court indicated in Ventura, Your Honor, which was specifically that you have to have an opportunity to look at change circumstances. Here it hasn't been five years. It has been three. She's remarried. Her husband, she doesn't know what his status is. He may be remarried. He may have moved. She at one point lived somewhere else in the country and perhaps could move somewhere else again. And I think Ventura tells us that both the government and the alien should have an opportunity to address those factors before the board on remand if the court would deem that. All right. Thank you, Your Honors. Thank you. We thank both counsel. This case is submitted for decision. Being the last case on today's calendar, then we will stand in recess. All rise. This court is in recess. This court is in recess. This court is in recess. This court is in recess.
judges: B Fletcher, Tashima, Pollak